IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 OCT -2  P  1: 38

CLERK _B Mc Carthy_
SO. DIST. OF GA.

AYANNA WIGGINS,                    *
                                  *
        Plaintiff,                *
                                  *
                                  *
        v.                        *          CV 109-142
                                  *
JOHN M. MCHUGH, Secretary,        *
Department of Army,               *
                                  *
        Defendant.                *


ᴏ ᴏ

**O R D E R**

ᴏ ᴏ


Plaintiff Ayanna Wiggins, a black female, is suing her
former employer, Defendant John M. McHugh, Secretary for the
Department of the Army, asserting claims of race
discrimination, retaliation, and hostile work environment.
The case is presently before the Court on the Army's motion
for summary judgment.   Upon consideration of the record
evidence, the relevant law, and the briefs of counsel, the
motion is **GRANTED**.


**I.   BACKGROUND**

**A.   Plaintiff's Early Employment**

Plaintiff was hired as a marketing assistant in the
office of Morale, Welfare, and Recreation ("MWR") at Fort

Gordon, Georgia, in June 2002.[1]  MWR is an organization that enhances "the quality of life and readiness by continually improving recreational, social, educational, and personal services to [] service members, their families and community."  As a marketing assistant, Plaintiff promoted MWR activities and programs.  She also worked on the MWR magazine - FYI - which advertises local businesses and promotes activities at Fort Gordon.  When Plaintiff starting working for MWR, FYI was a black-and-white booklet, less than thirty pages in length.

---

[1]   Unless otherwise indicated, the stated facts reflect Plaintiff's admissions to Defendant's Statement of Material Facts.  (See Doc. No. 66-1.)

The record contains depositions of witnesses as well as testimony and statements offered by witnesses during the EEO investigation by OCI (Office of Complaint Investigations).  The witness testimony offered during the OCI Fact-Finding Conference on April 8, 2008 will be referred to as "OCI Hrg."  Plaintiff testified at the OCI hearing and at a deposition on November 23, 2010.

Aside from these sources of evidence, Plaintiff also submitted an affidavit in response to Defendant's motion for summary judgment. Defendant has interposed an objection to the consideration of the affidavit, arguing that it contains conclusory and speculative allegations, matters not within Plaintiff's personal knowledge, and statements that flatly contradict Plaintiff's deposition testimony.  In setting forth the facts of this case in the light most favorable to Plaintiff, the Court has considered Defendant's objections to Plaintiff's affidavit, cognizant of the fact that "[c]onclusory, uncorroborated allegations in an affidavit will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion."  See Solliday v. Federal Officers, 413 Fed. Appx. 206, 207 (11th Cir. 2011). Thus, to the extent that Plaintiff's averments are simply bald allegations of impermissible motive attributed to others or matters not within her personal knowledge, this Court has not considered them.  However, Plaintiff's assertions of her own observations may be relevant and admissible, and where considered are noted herein, so long as such factual assertions do not flatly contradict her prior testimony.  In short, Defendant's objections to Plaintiff's affidavit filed in opposition to the motion for summary judgment have been duly noted and sustained where appropriate.

In the beginning, Plaintiff's immediate supervisor was the marketing director, Chris Rieke.  Shortly thereafter, Ellen Shepard became the marketing director.  The office in which Plaintiff worked was relatively small.  Kim Lyons worked as the commercial sponsorship coordinator. (Lyons Dep. at 11.) There was also a graphic designer, an illustrator, and a salesperson in the office.  Outside the immediate office, Plaintiff's second level supervisor was Mildred Hazelrigs, Chief of the Financial Management Division, and her third level supervisor was James Green, Director of MWR at Fort Gordon.

In December of 2002, Plaintiff became advisor to the Better Opportunities for Single Service members ("BOSS") program, which organizes special events and volunteer initiatives.  Plaintiff managed the day-to-day activities of the program, working with soldiers within the program and acting as a liaison to MWR.  Under the direction of Shepard, Plaintiff also became the editor of FYI.  Plaintiff explains this role as follows:

> I basically decided the things we were going to include in the magazine each month as far as like theme-wise.  I worked with the [facility] managers to get the information that they would be putting in.  If there were people available to write articles, I would work with them to get those articles, and I also wrote articles as well.  And I worked closely with Bartley Harper, the graphic designer.

(Pl.'s Dep. at 29.)

### B. Plaintiff's First EEO Complaint

In late 2005, Shepard resigned her position as marketing director, and both Plaintiff and Lyons applied for the position. Lyons, a white female, was hired, and Plaintiff filed an EEO complaint alleging race discrimination in February 2006. Plaintiff contends that the bachelor's degree requirement for the position was removed to allow Lyons, who did not have a degree, to obtain the job.[2] (Pl.'s Dep. at 18-21.) Plaintiff has a master's degree. (Id. at 8.)

As a result of her 2006 EEO complaint, the Army performed a desk audit at Plaintiff's request, which involved the evaluation of Plaintiff's job duties.[3] (See generally Pl.'s Dep., Ex. 1.) Thereafter, the Army changed Plaintiff's position to Public Relations Coordinator effective April 19, 2007. (Def.'s Ex. 4.) She did not get any additional duties, but her position became more focused on public relations as

---

[2] Plaintiff points out that Lyons had filed a sexual harassment claim against Green prior to the marketing director vacancy and that it was "a bit odd" that Green was on the selection panel for the position. (Pl.'s Dep. at 21-22, 80.) Plaintiff believes that Lyons's promotion to marketing director was part of the settlement of the sexual harassment case against Green. (Id. at 80.)

[3] Pursuant to the negotiated settlement agreement following the 2006 EEO complaint, the Army agreed "[t]o analyze [Plaintiff's] current duties as Marketing Assistant and submit a recommended position description title that more accurately reflects non-supervisory marketing professional duties and responsibilities." (Pl.'s Dep., Ex. 1.) The Army also agreed to approve and fund Plaintiff's attendance at job related courses or seminars. (Id.)

opposed to marketing.   Plaintiff retained her position as editor of FYI.

### C.   Plaintiff's Employment Under Lyons

According to Plaintiff, after Lyons became marketing director and her first level supervisor, Plaintiff's work atmosphere changed.  Plaintiff explains:

> I just really never knew what I was going to be dealing with when I walked into the office . . . . [Lyons] was just in my face a lot about things that — I felt like she tried to blame me for things that were not right . . . . I felt that, you know, prior to her being selected for the position, I was involved in marketing, like whatever we had going on, I was involved.  I had a role.  But once she became manager, I noticed that I was kind of being kept out of the loop on things that were directly related to my job.  When I would express that to her, I was often met with hostility.

(Pl.'s Dep. at 32.)  Plaintiff continues:

> And, you know, it wasn't so much that she made it difficult, because I could probably deal with that, but I noticed that other people in the office were not being treated the way that I was being treated.
>
> And so, you know, toward the end, the FYI magazine was the bone of contention.  That was the thing that, you know, constantly thrown in my face like I wasn't doing what I was supposed to do so that the magazine could go out in a timely manner. And I felt like it was less about that and more about the fact that she was in this role and she had the power to make my life hell, and she did.

(Id. at 33.)

The FYI magazine was indeed the bone of contention in Plaintiff's last years of employment.[4]   Beginning in March of 2006, during Lyons's first meeting with Plaintiff as her supervisor, the obligation to meet FYI's deadlines was stressed.  (Pl.'s Dep., Ex. 2.)  Hazelrigs was present during this meeting.  As early as April 5, 2006, Lyons again met with Plaintiff about missing deadlines (id., Ex. 3), although Plaintiff testified that Lyons had actually been trying to get Plaintiff to place blame on Bartley Harper, the graphics designer (id. at 50-51).  Lyons and Plaintiff met again on April 14, 2006, concerning missed deadlines for the May issue. (Id., Ex. 4.)

During this period of time, the marketing staff was putting more effort into FYI, and it became longer – 44 pages – and in full color.  The staff working on the magazine typically numbered four or five people.  Each month the staff met to discuss the upcoming issue.  Plaintiff coordinated with MWR facility managers throughout Fort Gordon to get their input for the month.  Plaintiff worked closely with Bartley Harper, who designed the graphics and laid out the magazine.  Plaintiff and Harper further contributed by writing articles.  Generally, in addition to Plaintiff and Harper, Henry Wynn provided

---

[4]   It was Lyons's practice to memorialize meetings with Plaintiff in "Memoranda of Record," wherein she summarized what transpired during their meetings.  For the most part, Plaintiff does not dispute the contents of the memoranda except in limited circumstances noted herein where relevant.

illustrations, and Sue Russell and Molly Swift sold and created advertisements.

As editor, Plaintiff would review each submission and make appropriate changes and then forward the submission to Harper to do the layout. The process was supposed to involve simultaneous work so that Harper could do the layout on one article or advertisement while Plaintiff was editing other submissions, which would later be provided to him. When the layout was complete, it was sent to an off-site printer.

At some point in Plaintiff's tenure as editor, Green, the Director of MWR, decided that the magazine needed to be available to the public four days before the end of the month.[5] This deadline imposed on the staff internal deadlines of anywhere between the 10th and the 15th of the month in order to get the final layout to the printer. Even though Plaintiff was the editor of FYI, she insists that she did not have primary responsibility for any missed deadlines. (Pl.'s Dep. at 40, 64; Pl.'s Aff. ¶¶ 5-6.) Instead, Plaintiff believes everyone involved had the duty to ensure deadline compliance, and she also contends that the missed deadlines were typically the fault of untimely submissions by others or a result of

---

[5] This publication date was important because FYI had advertisements and information for events occurring early in the month. (See Def.'s Exs. 6-7.)

being understaffed. (Pl.'s Dep. at 47, 59-60, 63-64; Pl.'s Aff. ¶¶ 5-6.)

The next encounter between Lyons and Plaintiff in the record occurred in June 2006. According to Lyons, during a telephone call between the two on June 21, 2006, Plaintiff expressed her dissatisfaction of having been "left out of the loop on many things." (Pl.'s Dep., Ex. 7.) Plaintiff further stated that she knew what Lyons was doing. (Id.) The next morning Lyons went to Plaintiff's office to ask Plaintiff to further explain her comments from the telephone conversation. During the ensuing conversation, Lyons asked Plaintiff to "keep [her] paranoia out of the office because it is clouding [Plaintiff's] judgement." (Id.) According to Lyons, Plaintiff became upset, raised her voice, and asked Lyons how she would have felt if someone had said that to her in relation to her accusation against Green for sexual harassment. (Id.) On January 22, 2006, Lyons placed a "Caution Memo" in Plaintiff's file for insubordination. In the memorandum, Lyons expressed that Plaintiff's "attitude and lack of respect for [her] authority is not acceptable behavior." (Id.)

On July 19, 2006, Plaintiff wrote a responsive memorandum for her file. (Id., Ex. 6.) While Plaintiff begins the memorandum by stating that the "telephone conversation

8

referenced did not transpire the way it is stated" in the June 22, 2006 memorandum, Plaintiff goes on to essentially admit all other pertinent statements between the two. (<u>Id.</u>) The entire exchange demonstrates the tension between Lyons and Plaintiff.[6]

On January 8, 2007, Lyons again reminded Plaintiff of "the seriousness of the FYI reaching the printer and [being] delivered to the racks" in accordance with Green's directive. (<u>Id.</u>, Ex. 8.) Plaintiff acknowledged that she understood there would be consequences for missing deadlines. In a memorandum of May 9, 2007, Lyons noted that Plaintiff had missed a deadline for the May 2007 issue, and they had discussed "why the FYI was continually late."[7] (<u>Id.</u>, Ex. 9.) This memorandum specifically mentioned that disciplinary action would be taken the next time a deadline was missed. (<u>Id.</u>) On June 25, 2007, Lyons wrote another memorandum memorializing a meeting with Plaintiff in which they had discussed the fact that a June FYI deadline was missed and that 10,000 copies of the July FYI issue were erroneously

_____

[6]  This tension did not go unnoticed. Harper testified: "[T]here seemed to be a lot of static between them and they didn't seem to get along . . . ." (Harper Testimony, OCI Hrg. at 106.) Molly Swift testified that she knew there were problems between them. (Swift Testimony, OCI Hrg. at 81 ("I think that towards the end of [Plaintiff's] employment that the stresses between the two of them, the tensions between the two of them were very obvious . . . .").)

[7]  The record is not clear as to whether the deadlines that were missed were internal deadlines imposed in creating the FYI magazine or the overarching deadline of publication. Plaintiff insists that it was typically the former and that the publication was publically available by the first of each month.

identified as the June issue. (Id., Ex. 10.) In her
deposition, Plaintiff admitted that the date error was a major
issue but pointed out that everyone could have accessed the
magazine on the server and caught the wrong date. (Pl.'s Dep.
at 60.) About this same time, Plaintiff met with Green to
discuss her employment. Green took away Plaintiff's
responsibility for the BOSS program so that she could focus on
marketing. (Id. at 27.)

Despite the missed deadlines, by all accounts Plaintiff's
work product was good. (Harper Dep. at 50-52; Swift Dep. at
14-15; Russell Testimony, OCI Hrg. at 67; Lyons Testimony, OCI
Hrg. at 134; Green Testimony, OCI Hrg. at 211.) In fact, in
September 2007, upon approval of Lyons, Hazelrigs, and Green,
Plaintiff received a $4000 salary increase based on her
performance. Nevertheless, Plaintiff missed a deadline for
the October FYI issue. Because of this missed deadline,
Plaintiff received a Decision Day memorandum on October 2,
2007, from Hazelrigs.[8] (See Pl.'s Dep., Ex. 12.)

A Decision Day memorandum allows management to give an
employee a day off without pay after which they must, upon

---

[8]  Hazelrigs noted that Plaintiff chose to attend an optional training
conference even though she had not completed the largest article for the
October issue. In fact, Plaintiff did not turn in the article until six
days after the proofed issue was due to the printer. (Pl.'s Dep., Ex.
12.) For her part, Plaintiff explained that she completed the article
while at the conference, that other submissions were also late, and that
the conference was job-related and intended to benefit the publication of
the magazine. (Pl.'s Dep. at 62-64.)

return, agree to abide by expected standards under threat of immediate termination upon the occurrence of another infraction.  Plaintiff signed the Decision Day memorandum on October 9, 2007, and while she agreed that a deadline had been missed, she denied responsibility.

On October 19, 2007, Plaintiff missed another internal deadline for the November FYI issue; yet, she was not terminated.  Rather, Plaintiff received a "Final Warning: Decision Day" memorandum from Hazelrigs.[9]  (Pl.'s Dep., Ex. 13.)  The memorandum stated: "It is apparent to me that you did not take the Decision Day seriously at all, nor the Employee Decision and Commitment you signed on October 9, 2007, to adhere to the performance expectations of your position and its responsibilities." (Id.)  Nevertheless, the memorandum noted that the infraction occurred so soon after the issuance of the Decision Day memorandum that Plaintiff was not terminated to afford her a "reasonable opportunity to appropriately modify [her] performance."  (Id.)

Plaintiff met with Green thereafter to stress that she believed the Decision Day memorandum to be unfair.  Green told

---

[9]    This "second" Decision Day memorandum was an extraordinary accommodation, at least so far as the written disciplinary policy is concerned - called the Cooperative Improvement Program.  With respect to Decision Day memoranda, this policy provides: "Because it is a total performance and conduct decision and commitment on the employee's part, only one 'Decision Day' is allowed.  No other formal levels of discipline may be administered during the active period of a 'Decision Day'.  Any unacceptable performance/conduct that warrants formal discipline at any level would be cause for removal." (Def.'s Ex. 7, at 39.)

Plaintiff that Lyons and Hazelrigs expressed to him that Plaintiff continually missed magazine deadlines.   Green advised Plaintiff to work with Lyons and tell her if Plaintiff believed she would miss a deadline.   (Green Testimony, OCI Hrg. at 212-13.)   Green offered to Plaintiff that if she reached her benchmarks for the next six months, he would consider withdrawing the Decision Day memorandum and giving her a raise.   (Id.)

### D.   Plaintiff's Separation from Employment

The events surrounding Plaintiff's termination center on a project unrelated to FYI, which will be referred to at times as the "collage project."   The project was initiated by and revolves around an e-mail chain, appearing in the record as Exhibit 15 to Plaintiff's deposition.   The e-mail chain reflects the following.

On November 20, 2007, Lyons received an e-mail from Tina L. Pondy, the supervisor of another department, requesting copies of prior marketing for certain events and pictures of certain facilities.   Lyons promptly forwarded the e-mail to Plaintiff, copying Harper, and asked her to complete the assignment "no later than 30 November."   The next day, Plaintiff inquired of Lyons whether she or Harper should complete the task.   Lyons replied: "You" - indicating Plaintiff.

On November 29, 2007, the day before the deadline,
Plaintiff e-mailed Lyons to inform her that Pondy was out of
work for a few days having surgery and to ask what she should
do with the assignment.  To that point, Plaintiff had not
worked on the assignment.[10]  (Pl.'s Dep. at 79.)  On December
3, 2007, Plaintiff again e-mailed Lyons and told her that
Pondy had come by asking that the project be completed by the
next day.[11]  Plaintiff indicated that Pondy stated that she
"would like to sit down with [Harper], if necessary, to go
over what she needs."  Within an hour, Lyons responded to
Plaintiff as follows: "Please do what needs to happen.  Get
pictures together that she is requesting.  Look at the old
FYI's [sic] and pull together what she needs."  Within
minutes, Plaintiff informed Lyons that she did not have access
to the requested information and asked if she could involve
Harper.[12]  Lyons responded within minutes - at 3:10 p.m. - as
follows: "The pictures she wants are some of them that we have

---

[10]   Plaintiff testified that prior to this date, Plaintiff and Lyons
discussed the collage project and Plaintiff explained that the project
required a graphics designer.  (Pl.'s Dep. at 67.)   According to
Plaintiff, Lyons did not want to take Harper off his work on the FYI
magazine, but she told Plaintiff that she would discuss the matter with
Hazelrigs.  Plaintiff testified that she was awaiting further word on who
was responsible for completing the collage project.  (Id. at 67-69.)

[11]   Lyons was on leave and not in the office on December 3, 2007.

[12]   Plaintiff testified that she believed the project fell under the
graphics department and therefore was best handled by Harper.  (Pl.'s Dep.
at 67-68.)  Yet, Plaintiff did not want to involve Harper until given
express permission to do so.  (Id. at 70-71.)

had in past issues.  Also pictue [sic] of the actual facility.
It show[s] the renovations."

During the OCI fact-finding conference in April 2008,
another copy of the e-mail chain surfaced, which is attached
as Exhibit 16 to Plaintiff's deposition.  In the new e-mail
chain,  Lyons's last responding e-mail – also sent at 3:10
p.m. – stated:  "I gave you ideas on what to do.  Just please
use the info that we used for the FYI.  After you gather all
the info if you need [Harper] to help then okay."  Plaintiff
denies ever receiving this last e-mail giving her permission
to involve Harper.  (Pl.'s Dep. at 74-75.)  In fact, Plaintiff
contends that the last e-mail is a fraud.[13]  (Id. at 75.)

Some time after receiving the last e-mail, Plaintiff left
work  early.   The  next  day,  Lyons  aggressively  entered
Plaintiff's office and informed Plaintiff that she had to come
in from leave and she and Harper had to work late to complete
the project.  (Pl.'s Dep. at 69.)  Lyons told Plaintiff that
she  could  have  done  the  work.   (Id.)   After  further
conversation,  Plaintiff  was  sent  home.   (Id.  at  61.)
Thereafter, Plaintiff was terminated, effective December 21,

---

[13] Specifically, Plaintiff contends that Lyons created the e-mail giving
Plaintiff permission to involve Harper after the fact to justify her
termination  of  Plaintiff.   The  parties'  experts  were  unable  to
electronically recover the allegedly fraudulent e-mail communication.
Viewing the evidence in the light most favorable to Plaintiff, the Court
will assume that Lyons never sent the last communication to Plaintiff but
instead the e-mail was somehow created after the fact.

14

2007.   (See id., Ex. 14.)   The stated reason for the termination is Plaintiff's failure to complete an assigned project.[14]   (Id.)

### E.   Plaintiff's 2007 EEO Complaint

On October 10, 2007, Plaintiff filed an informal administrative EEO complaint alleging discrimination based upon her receipt of the Decision Day memorandum of October 2, 2007.  Plaintiff then amended her EEO complaint to include her termination on January 22, 2008.  (See Sec. Am. Compl., Ex. A.)

On January 28, 2008, Plaintiff filed her Formal Complaint of Discrimination, listing "wrongful termination (Dec 2007)" and "retaliation/reprisal (Oct 2007)" as acts of discrimination.  (Id., Ex. C.)  On March 31, 2008, the EEO Officer identified the following claims on Plaintiff's behalf: (1) the issuance of the Decision Day memorandum of October 2, 2007 was a result of Plaintiff's race and reprisal for prior EEO activity, and (2) Plaintiff's termination was the result of reprisal for prior EEO activity.  (Id., Ex. F.)

On April 8, 2008, a Fact-Finding Conference was conducted in the matter.  On June 24, 2008, the EEO released a Report of Investigation, which identifies Plaintiff's claims as follows:

---

[14]   Specifically, the separation letter states: "[N]ot only did you not provide any of the requested information necessary to complete and meet the suspense, you also left the office for the day without completing any of the project material."  (Pl.'s Dep., Ex. 14.)

(1) Plaintiff was discriminated against based upon her race and reprisal when she was issued the Decision Day memorandum of October 2, 2007, and (2) Plaintiff's termination was the result of reprisal for prior EEO activity.  (Id., Ex. H.) Ultimately, Plaintiff received an unfavorable administrative decision, and her appeal and motion for reconsideration were denied.  Plaintiff was represented by counsel throughout the administrative proceedings.

Plaintiff timely filed the instant action in this Court on November 13, 2009.  Upon direction of the Court, Plaintiff filed a Second Amended Complaint on April 28, 2010.  The Second Amended Complaint (doc. no. 18) is the operative pleading in this case.  In Count I of the Second Amended Complaint, Plaintiff alleges that Defendant took certain adverse actions against her because of her race and because of her prior EEO activity.  In Count II of the Second Amended Complaint, Plaintiff alleges that she was subjected to a "racially hostile work environment."

Presently, Defendant has moved for summary judgment on Plaintiff's discrimination claims.  The Clerk has given Plaintiff notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default.  (Doc. No. 61.)  Therefore, the notice requirements

of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," <u>United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  How to carry this burden depends on who bears the burden of proof at trial.  <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112,

1115 (11ᵗʰ Cir. 1993).  When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11ᵗʰ Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Jones v. City of Columbus, 120 F.3d 248, 254 (11ᵗʰ Cir. 1997) (per curiam).  A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient.  Clark, 929 F.2d at 608.

If – and only if – the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  Id.  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with

evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

### III.   LEGAL ANALYSIS

#### A. Race Discrimination

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). According to Plaintiff, she was discriminated against because of her race, and such

discrimination reached expression in two different forms: (1) the issuance of the Decision Day memorandum on October 2, 2007; and (2) her termination in December 2007.  On the record evidence, these charges are groundless.

Title VII plaintiffs may prove race discrimination claims in either of two ways - either through the production of "direct evidence" of discrimination or through the production of "circumstantial evidence" that creates an inference of discrimination.  Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999).  In this case, Plaintiff has advanced only circumstantial evidence.

When a plaintiff bases her case on circumstantial evidence, the so-called burden shifting analysis of McDonnell Douglas and its progeny is used.  The burden shifting analysis requires a plaintiff to first come forward with evidence sufficient to establish a prima facie case of discrimination. This creates a rebuttable presumption of unlawful discrimination.  The defendant is then called upon to articulate a legitimate, non-discriminatory reason for its allegedly discriminatory decision.  The production of this reason serves to shift the burden back to the plaintiff, who then must produce evidence of "pretext," that is, to show the proffered reasons are "not the true reasons for the employment decision."  See Brooks v. County Comm'n of Jefferson Cnty.,

Ala., 446 F.3d 1160, 1162-63 (11th Cir. 2006) (citations and
quoted sources omitted).  "Although the intermediate burdens
of production shift back and forth, the ultimate burden of
persuading the trier of fact that the employer intentionally
discriminated against the employee remains at all times with
the plaintiff."  Id. at 1162 (quoting EEOC v. Joe's Stone
Crab, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002)).

    1.   Prima Facie Case of Discimination

    In accordance with this burden shifting analysis, the
Court will first look to whether Plaintiff has established a
prima facie case of discrimination in the instant case.  A
plaintiff may establish a prima facie case of disparate
treatment by showing that: (1) she is a member of a protected
class; (2) she was qualified for the position; (3) she
suffered an adverse employment action; and (4) she was
replaced by a person outside of her protected class or was
treated less favorably than a similarly-situated individual
outside of her protected class.  Maynard v. Bd. of Regents of
Div. of Univs. of Fla. Dep't of Educ., 342 F.3d 1281, 1289
(11th Cir. 2003).  Here, it is undisputed that Plaintiff
belongs to a protected class, was qualified for her position,[15]

_____

[15] "Of course, the fact that [Plaintiff] was qualified to perform her job
competently does not mean that she actually did so, an issue that is
sharply contested by the parties."  Alvarez v. Royal Atl. Developers,
Inc., 610 F.3d 1253, 1265 (11th Cir. 2010).  "The qualifications and
experience that get a candidate hired for a job and the performance that
is satisfactory enough for her to keep it are two different things."  Id.

and suffered an adverse employment action when she received the Decision Day memorandum and then was terminated.

With respect to the fourth prong, however, the Army contends that Plaintiff has not identified a valid comparator, while Plaintiff goes to great length to point out that she was treated unfavorably as compared to the other employees who were similarly responsible for meeting deadlines for the publication of FYI.[16] More specifically, Plaintiff complains that Harper and Swift were never disciplined when they missed deadlines.

To be a valid comparator, the plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). The Army points out that there is only one person, Plaintiff, who was the editor of FYI and that she therefore was ultimately responsible for meeting deadlines. However, the Eleventh Circuit has pronounced that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to

---

Because Plaintiff's job performance is bound up in the inquiry of whether the Army's proffered reason for firing her was pretext for discrimination, the Court will consider it at the pretext stage of the analysis. Id.

[16] Of note, Plaintiff does not rely upon the race of Plaintiff's immediate successor to the FYI editorship to establish a prima facie case of discriminatory termination even though there is record evidence that a white female, Amanda Hamilton, took over the position, albeit informally, when Plaintiff was terminated. (See Swift Testimony, OCI Hrg. at 92.)

different policies." <u>Lathem v. Dep't of Children & Youth</u>
<u>Servs.</u>, 172 F.3d 786, 793 (11th Cir. 1999).  Thus, Plaintiff's
*editorship* is not determinative of whether she has a valid
comparator.  Rather, viewing the evidence in the light most
favorable to Plaintiff, both Swift and Harper testified that
the timely publication of FYI was a collective effort, and
both Swift and Harper missed deadlines. (Swift Testimony, OCI
Hrg. at 76-77; Harper Dep. at 61-62; Harper Testimony, OCI
Hrg. at 100-04 (admitting it was his responsibility to make
sure the magazine got to the printer on time).)   More
importantly, Plaintiff did not have any supervisory or
disciplinary control over the other employees working on the
magazine. (Harper Dep. at 47; Pl.'s Aff. ¶ 6.)    Thus,
Plaintiff's ability to meet deadlines was, at least in part,
dependent upon other employees or clients over whom she had no
real control.  Yet, no other employee received a Decision Day
memorandum for failing to miss deadlines.

In short, for purposes of summary judgment consideration,
the Court finds Swift and Harper to be valid comparators, and
in doing so, Plaintiff has at least created a material fact
question pertaining to a prima facie case of discrimination.

    2.   <u>Legitimate, Non-Discriminatory Reason</u>

Assuming Plaintiff can establish a prima facie case of
discrimination, the burden shifts to the Army to articulate

23

legitimate, non-discriminatory reasons for its adverse actions taken against Plaintiff.  This burden is "exceedingly light." Holifield, 115 F.3d at 1564.  "To satisfy this intermediate burden, the employer need only procure admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted).

In this case, the Army has amply demonstrated by admissible evidence that the Decision Day memorandum was issued because Plaintiff *continually* missed FYI deadlines despite warnings from her supervisors that discipline would be taken.  Once the Decision Day memorandum was issued, any infraction by Plaintiff could result in immediate termination, and it did.  That is, the Army has provided evidence that Plaintiff disobeyed a directive to complete an assigned project.  Thus, the Court readily concludes that the Army has met its burden of production in coming forward with legitimate non-discriminatory reasons for the adverse actions taken against Plaintiff.

   3.   Pretext

This case turns on whether there is a genuine issue of material fact with respect to pretext. In order to show pretext, a plaintiff must "demonstrate that the proffered

24

reason was not the true reason for the employment decision." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. The plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538 (quotation omitted). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). So, when an employer asserts that it disciplined a plaintiff for poor performance, it is not enough for the plaintiff to show that her performance was satisfactory. Alvarez, 610 F.3d at 1266. Rather, she must demonstrate that the employer did not believe that her performance was lacking and merely used that claim "as cover for discriminating against her on account of [her race]." Id.

In the case at bar, Plaintiff does not attempt to argue that she did not miss deadlines; rather, she argues at length that the Army held the missed deadlines against her alone and that to do so was unfair in light of the attendant circumstances. However, the fact that Plaintiff feels unfairly blamed for the missed deadlines is beside the point. The inquiry into pretext centers on the *employer's* beliefs, not the employee's beliefs. See Holifield, 115 F.3d at 1565. The question in consideration of pretext is whether Plaintiff's supervisors were dissatisfied with her for missing deadlines or any other non-discriminatory reason, even if mistakenly or unfairly so, or whether they used the missed deadlines as a cover for race discrimination. See, e.g., Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (inquiry is limited to whether employer believed employee was guilty of misconduct and if so, whether that was the reason behind discharge; that employee did not actually engage in misconduct is irrelevant). Thus, Plaintiff must establish not only that the Army's proffered reasons for the Decision Day memorandum and termination were ill-founded, but also that unlawful discrimination was the true reason for the termination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (showing only that proffered reasons

are false does not necessarily get plaintiff past summary judgment).

Here, Plaintiff failed to rebut much of the Army's legitimate, non-discriminatory reasons for taking adverse actions against her. In fact, Plaintiff admits that she missed deadlines but defends herself by shifting the blame to her co-workers or to other outside facility managers. She also blames the poor supervision and management of Lyons. Similarly, she admits that she did not complete the collage project, but she again shifts the blame to Lyons. Thus, Plaintiff cannot seriously contend that the Army's belief that she was not meeting her responsibilities and deadlines was unreasonable.

Plaintiff instead would have the Court second-guess the correctness of the Army's decision to hold her accountable for this conduct. Yet, the Eleventh Circuit has cautioned that in analyzing issues like this one, a court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). Instead, the sole concern is whether "unlawful discriminatory animus" motivated the adverse decisions. Id. In this case, Plaintiff presents no evidence that her employer acted with discriminatory animus. The only evidence related to race is Plaintiff's assertion that Lyons

often stated to her and others that Green did not like black people.[17]   (See Pl.'s Dep. at 41-42.)   This testimony is at best double hearsay.   Further, even if Green had commented that he did not like black people, a discriminatory comment, taken alone, is not enough to present a question of material fact on the issue of discriminatory intent.   See Rojas, 285 F.3d at 1343; Beaver v. Raynoier, Inc., 200 F.3d 723, 731 (11th Cir. 1999).   Accordingly, the Court finds that any alleged discriminatory statement made by Green about black people, taken alone, is insufficient to create an issue of material fact regarding whether the Army's proffered reasons for the adverse treatment of Plaintiff were motivated by Green's alleged discriminatory animus.[18]

Plaintiff also again offers the dissimilar treatment of her so-called comparators, Harper and Swift, as evidence of pretext.   Plaintiff points out that they were not subjected to the same level of discipline as she was when deadlines were

---

[17]   Plaintiff also indicates in her affidavit that she had been told that there were "too many Black people" in the FYI magazine.   (Pl.'s Aff. ¶ 6.) This comment, even if made, is unavailing to Plaintiff when she unequivocally disclaimed in her deposition that she was not told there was too much coverage for black people or anything related to this sentiment. (See Pl.'s Dep. at 111.)   Thus, Plaintiff's contrary assertion in her affidavit has not been considered.   See Van T. Junkins & Assocs. v. U.S. Indus. Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

[18]   Importantly, Plaintiff has offered no evidence that either Hazelrigs or Lyons made racist remarks or acted in a racially biased manner.

missed.[19]   However, it is irrelevant that Plaintiff believed she was not ultimately responsible for the timeliness of the publication or even that Harper and Swift believed that the magazine was a collective effort.   Rather, Plaintiff's supervisors expressly indicated to Plaintiff on several occasions that she was responsible for the timely publication of the magazine and that continually missing deadlines was an unacceptable performance problem which would subject her to further discipline.   The numerous counseling meetings memorialized by undisputed memoranda establish this point. Thus, the alleged dissimilar treatment of other employees does not show pretext.

Turning to her termination, Plaintiff offers certain discrepancies in Lyons's conduct in the case as evidence of pretext.   In particular, Plaintiff points to the allegedly false e-mail, Exhibit 16, which shows that Lyons told Plaintiff she could involve Harper on the collage project – an allowance Plaintiff contends she never received.   Plaintiff argues that this fraudulent e-mail makes the Army's legitimate, non-discriminatory reason for firing her unworthy of credence.   Nevertheless, Plaintiff admits that she did not do any work on the collage project until the day before the

---

[19]   There is evidence, however, that Harper and Swift both received informal disciplinary warnings or letters for missing deadlines. (Harper Dep. at 61-65; Hazelrigs Dep. at 36; Swift Testimony, OCI Hrg. at 77.)

project deadline. She also does not dispute that Lyons sent her an e-mail that told her to "please do what needs to happen." Certainly, Lyons did not tell her that she could not involve Harper. Even after Plaintiff asked Lyons if she could involve Harper, Lyons did not forbid her from doing so. Accordingly, this after the fact permission to involve Harper does little to discredit Lyons's belief that Plaintiff should have completed the collage project, with or without Harper's assistance, instead of leaving early that day. That is, Lyons did not need to create justification to terminate Plaintiff when she already had a reason to do so.

Additionally, Plaintiff points to a discrepancy between the testimony of Lyons and Harper as it relates to the completion of the collage project. While Harper testified that he completed the project by himself (Harper Dep. at 56-57), Lyons testified that she and Harper worked on the project (Lyons Dep. at 120). However, there is no real inconsistency in their testimony because Harper testified that Lyons "told [him] what she needed. . . . [S]he just told me what needed to be done, what I needed to include, and I did that." (Harper Dep. at 57.) It is undisputed that Lyons came in on her day off to direct Harper in completing the project and is indeed the supervisor; in light of these facts, it is not unreasonable for Lyons to assert that she helped in completing

the project, even if she did not do the actual work.  This
alleged inconsistency simply is not enough to discredit
Lyons's account of Plaintiff's termination to an extent to
raise an issue of pretext for a jury.

Clearly, Plaintiff feels that she was unfairly targeted
for failing to perform her job duties as editor of a magazine.
Yet, several undisputed facts belie this suggestion.  First,
Plaintiff was not terminated for over a year after Plaintiff's
insubordination of June 2006.  Second, she was given numerous
warnings about deadline compliance over a two-year period.
Third, in the months leading up to her termination, Green
relieved Plaintiff of her responsibility for the BOSS program
to give her more time to focus on FYI.   Fourth, Plaintiff was
given a discretionary raise a few months prior to her
termination.  Fifth, Green offered to rescind the Decision Day
memorandum if Plaintiff complied with the deadlines over a
six-month period.  Finally, the Army issued Plaintiff a *second*
"Final Warning: Decision Day" memorandum on October 19, 2007,
rather than terminating her after missing a deadline following
the Decision Day memorandum.   These actions evidence an
employer that made a good-faith effort to work with Plaintiff
in an effort to improve her performance over a significant
amount of time.  While putting the ultimate responsibility of
meeting deadlines on Plaintiff and holding her responsible to
complete the collage project may be construed as unfair,

Plaintiff has failed to show any improper motive. "[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984). Further, the alleged discrepancies in Lyons's conduct in the case do not sufficiently discredit the undisputed facts of Plaintiff's performance failings to evidence pretext.

In conclusion, Title VII addresses *discrimination* in the workplace, not harsh treatment. See id. Whether the Army's course of action against Plaintiff appears harsh, erroneous, unfair, or even incredible to her or an outside observer, Plaintiff cannot prevail without evidence of discriminatory intent. Stated another way, Plaintiff's burden is to show not just that the Army's proffered reasons for any adverse action were ill-founded but that unlawful discrimination was the true reason. See Alvarez, 610 F.3d at 1267. Instead, the record indisputably shows Plaintiff failed to satisfy her employer's job expectations, and Plaintiff has failed to create a genuine issue that these failings were cover for racial discrimination. Defendant is therefore entitled to summary judgment on Plaintiff's claim of race discrimination.

**B.    Retaliation**

Title VII makes it unlawful for an employer to discriminate against an employee in retaliation for opposing

32

"any practice made an unlawful employment practice [under Title VII]." 42 U.S.C. § 2000e-3(a). Plaintiff contends that adverse employment actions were taken against her in retaliation for her 2006 EEO complaint and her October 2007 informal EEO complaint related to the issuance of the Decision Day memorandum.

Where, as here, a plaintiff's retaliation claim is based on circumstantial evidence, the claim is also analyzed according to the burden shifting framework set forth in McDonnell Douglas and its progeny. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010). Thus, in order to survive summary judgment, Plaintiff must set forth a prima facie case to create a presumption of retaliation. Once satisfied, the Army must rebut this presumption of retaliation by articulating legitimate, non-retaliatory reasons for its adverse actions. Plaintiff must then come forward with evidence sufficient to permit a reasonable fact finder to conclude that the adverse action taken by the Army was retaliatory. See, e.g., Cowan v. Jackson Hosp. & Clinic, Inc., 572 F. Supp. 2d 1286, 1289 (M.D. Ala. 2008) (cited sources omitted).

The elements of the prima facie case of retaliation are (1) protected activity, (2) adverse employment action, and (3) a causal link between the protected activity and the adverse

action.  Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 919 (11th Cir. 1993).  Here, the parties do not dispute that Plaintiff engaged in protected activity and suffered adverse employment actions.  The third element is in dispute.

Causation may be established by showing close temporal proximity between the statutorily protected activity and the adverse employment action.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).  Defendant contends that the eighteen-month period between Plaintiff's filing of the 2006 EEO complaint and the issuance of the Decision Day memorandum on October 2, 2007, precludes a finding of a causal connection between the two.  Plaintiff responds that the more relevant fact is that within weeks of her filing the 2006 EEO complaint, her work environment became in her words "hostile." (See Pl.'s Dep. at 32.)  Plaintiff continues that this hostility, evidenced by the imposition of stringent deadlines and being "kept out of the loop on things," was ongoing and culminated in the Decision Day memorandum.  (See id.)  For purposes of summary judgment, the Court will assume that Plaintiff's work environment changed in March or April of 2006, shortly after she filed the EEO complaint in February of 2006.  Given this assumption, a reasonable fact finder could find a causal connection between Plaintiff's 2006 EEO activity and the issuance of the Decision Day memorandum.  Thus,

Plaintiff has established a prima facie case of retaliatory discipline.

Plaintiff also claims that she was terminated in retaliation for filing an informal EEO complaint in October 2007 concerning the issuance of the Decision Day memorandum. Here, there is sufficient temporal proximity – approximately one month – to establish a prima facie case of retaliatory discharge as well.

As discussed previously, the Army has produced evidence that could allow a rational fact finder to conclude that its adverse actions against Plaintiff are supported by legitimate reasons and not a retaliatory one. Thus, the burden of production now shifts to Plaintiff to establish pretext.

To establish pretext Plaintiff may either produce evidence sufficient to permit a reasonable fact finder to conclude that a retaliatory reason more than likely motivated the adverse employment action or demonstrate that the Army's proffered reason for the employment action is not worthy of belief. See Burdine, 450 U.S. at 256. In this regard, Plaintiff has presented no evidence of a retaliatory motive on any decision maker's part. Moreover, she offers the same evidence of pretext as she did with respect to her race discrimination claim.

Plaintiff first points out that when Lyons became

supervisor, her work atmosphere changed and she was treated differently from her co-workers.  Plaintiff argues that her working conditions are evidence that the Army's motive in issuing the Decision Day memorandum is the result of reprisal. A closer look at the evidence supporting this claim is in order.  Plaintiff complains that Lyons was "in [her] face" and tried to blame her for things.  (See Pl.'s Dep. at 32.)  More specifically, Plaintiff feels as though she was singled out for responsibility for FYI's deadlines.  To this point, however, "different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."  Rojas, 285 F.3d at 1343.  Plaintiff does not dispute that she missed deadlines or that deadline compliance was important to her employer.  Accordingly, the fact that such compliance became a focal point of Plaintiff's job performance under Lyons's supervision does not create an issue of fact with respect to causation.[1]  Further, it must be noted once again that the Army withstood Plaintiff's performance failings over a prolonged period and made allowances for Plaintiff to retain her job despite her failings.  The temporal gap between the EEO complaint and the first adverse

---

[1]  The new supervisor was not the only change at the marketing office.  The FYI magazine was significantly expanded at a time coinciding with the alleged hostility about deadline compliance and Plaintiff's alleged diminished role in other marketing activities.

action of which Plaintiff complains, the Decision Day memorandum, are in fact so remote in time as to belie an assertion of reprisal. Thus, the so-called mistreatment[2] of Plaintiff is not sufficient evidence to create a genuine issue of pretext.[3]

The Eleventh Circuit has recently stated: "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." Alvarez, 610 F.3d at 1270. On this record, however, Plaintiff is attempting to do just that. That is, with no evidence of retaliatory motive on behalf of any supervisor, Plaintiff seeks to have the mere fact of filing an EEO complaint insulate her from further discipline or criticism. And, while there is no finding that Plaintiff intentionally filed any EEO complaint for that purpose, the Court will not allow Plaintiff's filings to achieve the same

_____

[2]  To be clear, there can be no finding that Plaintiff suffered from a hostile work environment as that term is defined in employment discrimination cases. That is, Plaintiff has not established that the alleged mistreatment rose to the level of harassment "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

[3]  Additionally, Plaintiff points to the allegedly fraudulent e-mail and the inconsistency in Lyons's testimony concerning the collage project. This evidence would only apply to her retaliatory discharge claim, and as explained before, it is insufficient to make the Army's legitimate, non-discriminatory reasons for her termination unworthy of credence.

result in a case in which the employee was offered as many accommodations by the employer as this employee was.

In light of the fact that Plaintiff has failed to rebut the Army's legitimate, non-discriminatory reason for the issuance of the Decision Day memorandum or her termination, the Court finds that Plaintiff has not demonstrated that its reason was pretextual. Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### C. Racially Hostile Work Environment

A hostile work environment claim is a species of action available under Title VII, founded upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation and quotations omitted). In this case, Plaintiff alleges that she "was subjected to a racially hostile environment due to the misconduct of her supervisors and her co-workers because she was an African American and because she had previously reported racially motivated misconduct on the part of her supervisors in the past." (Second Am. Compl. ¶ 28.) The Army contends that Plaintiff has failed to exhaust her administrative remedies with respect to this claim, and even

if she had, such claim fails as a matter of law.

It is well settled that prior to filing an employment discrimination claim, a plaintiff must first file a charge of discrimination with the EEOC.  Gregory v. Georgia Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004).  "The purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer."  Wade v. Secretary for the Army, 796 F.2d 1369, 1377 (11th Cir. 1986).  The Eleventh Circuit has made clear that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Gregory, 355 F.3d at 1279 (internal quotation and citation omitted).

In this case, Plaintiff never indicated to the OCI, the investigating authority, that she felt that she labored in a racially hostile work environment.  Indeed, the OCI framed Plaintiff's claims on two occasions: (1) in a Memorandum dated March 31, 2008, and copied to Plaintiff's attorney, and (2) in the June 24, 2008 Report of Investigation.  Neither of these documents include a claim of racially hostile work environment; rather, they identify only Plaintiff's claims of discrimination based upon discrete disciplinary action taken against her, i.e., the Decision Day memorandum and her

termination.  (See Sec. Am. Compl., Exs. F & H.)  Simply put, Plaintiff did not exhaust her administrative remedies with respect to her racially hostile work environment claim because she never raised such claim in the OCI proceedings.

Even if the Court considered the claim, it would fail. To establish a hostile work environment, a plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment was based her membership in a protected group; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a bais for holding the employer liable.  Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1143 (11th Cir. 2008); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). Application of this rubric demands a fact-intensive survey of the alleged harassment, but summary judgment is "appropriate to police the baseline for hostile environment claims." Mendoza, 195 F.3d at 1244.

In the case at bar, Plaintiff cannot establish that the alleged harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  The "severe or pervasive" requirement contains

40

both a subjective and an objective component.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002). That is, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza, 195 F.3d at 1246.  When determining whether a work environment is sufficiently hostile under this standard, there are four general factors to be considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."

Here, the only evidence that Plaintiff has identified as harassment based upon her race is the allegation that Lyons often stated that Green did not like black people.[4]  Notably, Plaintiff never testified that she found these statements threatening or humiliating nor did she contend that the statements interfered with her job performance.  Race related statements standing alone will not suffice to support a claim

---

[4] There is ample evidence to support a finding that Plaintiff was harassed by Lyons, and perhaps others, with respect to meeting deadlines for publication of the FYI magazine.  However, there is no evidence that this harassment was racially based or motivated other than Plaintiff's conclusory allegations to the contrary.  Thus, to the extent Plaintiff suffered harassment, it was not based on her race.

of hostile work environment; rather, to sustain such a claim based solely on racial comments, the comments "must be so commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1325 (N.D. Ga. 2001) (quoting EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990)); see also Rojas, 285 F.3d at 1344 ("[A] plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . ." (quoted source omitted)).

In short, the sporadic comments to which Plaintiff refers did not create a racially charged atmosphere or permeate the workplace. That is, Plaintiff has utterly failed to show that aside from the pressure of putting out the FYI magazine on time, she was subjected to racially charged conduct sufficiently offensive to constitute *objectively* unreasonable behavior. Thus, any racially hostile work environment claim surviving Defendant's exhaustion challenge fails as a matter of law, and Defendant is entitled to summary judgment on such claim.

## IV.   CONCLUSION

Upon the foregoing, Defendant's motion for summary judgment (doc. no. 59) is **GRANTED**. The Clerk is instructed to

**CLOSE** this case and **ENTER JUDGMENT** in favor of Defendant.

   **ORDER ENTERED** at Augusta, Georgia, this _____day of October, 2012.

UNITED STATES DISTRICT JUDGE